FILED
2021 DEC 21 PM 1:10
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| L.S. and B.S., <br><br> Plaintiffs, <br><br> v. <br><br> BEACON HEALTH OPTIONS and the CHEVRON MENTAL HEALTH & SUBSTANCE ABUSE PLAN, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:20-cv-00460-JNP-JCB <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Jared C. Bennett |

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, and is before the court on the parties' cross-motions for summary judgment.

## BACKGROUND

This dispute involves the denial of benefits allegedly due to L.S. and B.S. (collectively, "Plaintiffs") under their ERISA employee group health benefit plan, the Chevron Mental Health and Substance Abuse Plan ("the Plan"). Chevron Corporation is the Plan Sponsor and Administrator. CV Rec. at 69.[1] Beacon Health Options ("BHO") is the Claims Administrator for

---

[1] Some pages in the record are Bates stamped with "CV" and others with "BHO." Accordingly, the court will refer to "CV Rec." for those pages Bates stamped with CV and "BHO Rec." for those pages Bates stamped with BHO. For brevity, the court has also removed excess leading zeros from the Bates stamp numbers.

the Plan. *Id.* at 6. Under the Plan, BHO has discretionary authority to interpret Plan provisions and make decisions regarding specific claims for benefits and appeals of benefit denials. *Id.* at 175. L.S. was a Plan participant at all times relevant to the claims in this case and his son, B.S., was a Plan beneficiary.

Plaintiffs sought care for B.S.'s mental health and substance use conditions at Catalyst Residential Treatment Center ("Catalyst") in Utah. B.S. received care at Catalyst from June 28, 2016 to May 22, 2017. BHO Rec. at 5. BHO denied benefits for the entirety of B.S.'s stay at Catalyst. *Id.* Plaintiffs contend that BHO's denial of benefits caused them to pay over $75,000 in unreimbursed, out-of-pocket expenses. ECF No. 2 ¶ 32.

**I.     THE PLAN**

The Plan offers benefits for medically necessary mental health and substance abuse care. CV Rec. at 40. The plan does not cover "[s]ervices that aren't considered medically necessary and appropriate," as determined by the claims administrator. *Id.* at 51. The Plan defines medically necessary services as those that are

- Intended to prevent, diagnose, correct, cure, alleviate or preclude deterioration of a diagnosable condition (ICD-9 or DSM-IV) that threatens life, causes pain or suffering or results from illness or infirmity.
- Expected to improve an individual's condition or level of functioning.
- Individualized, specific and consistent with symptoms and diagnosis and not in excess of patient's needs.
- Essential and consistent with nationally accepted standard clinical evidence generally recognized by mental health or substance abuse care professionals or publications.
- Reflective of a level of service that is safe, where no equally effective, more conservative and less costly treatment is available.
- Not primarily intended for the convenience of the recipient, caretaker or provider.
- No more intensive or restrictive than necessary to balance safety, effectiveness and efficiency.
- Not a substitute for non-treatment services addressing environmental factors.

*Id.* at 101.

The Plan defines a residential treatment center ("RTC") as a program that "[p]rovides structured mental health and/or substance abuse treatment that includes medical supervision by a doctor (M.D./D.O.) and is staffed by a multidisciplinary team, which may include doctors (M.D.s, Ph.D.s), psychologists, social workers, substance abuse counselors, registered nurses (R.N.s) and other health care professionals." *Id.* at 229. Upon Plaintiffs' request, BHO clarified that in order for Catalyst to be considered medically necessary under Beacon's RTC criteria, the program must include

- Confirmation of weekly visits with an MD Psychiatrist at Catalyst.
- A program schedule that demonstrates structured therapeutic programming, led by a licensed professional, for at least 6 hours of therapeutic activities of some kind, 7 days per week. Progress notes should include documentation regarding [B.S.'s] progress toward treatment goals during these activities.
- Evidence of 24-hour supervision by licensed personnel. This does not include 'on-call' personnel.
- An individualized treatment plan for [B.S.], including specific goals and, when progress reports are noted, [B.S.'s] progress toward those individualized goals.
- Ongoing clinical updates that contain documentation that Catalyst is monitoring his symptoms, providing adequate behavioral and medical treatment, and that provided services continue to meet medical necessity.
- In order to successfully be paid by Beacon and the Chevron plan, the facility must bill using industry-accepted coding for residential treatment centers, etc.

BHO Rec. at 146-47.

The Plan includes a notification requirement for out-of-network services. The Plan pays for 80% of allowed inpatient mental health and substance abuse benefits for out-of-network services if the member notifies BHO within two days of admission. CV Rec. at 34-37. If the member fails to meet the notification requirement, then the Plan pays 60% of allowed charges for out-of-network services. *Id.*

## II.     B.S.'S CONDITION AND TREATMENT

B.S. grew up abroad, primarily in Australia. BHO Rec. at 123. B.S. and his family moved to Houston, Texas in January 2014. *Id.* Within two months, B.S.'s parents began noticing changes in B.S.'s behavior. *Id.* B.S. withdrew from his family and schoolwork. *Id.* at 123-24. B.S.'s condition continued to deteriorate; in August 2014, he had a major anxiety attack. *Id.* at 124. As a result, B.S.'s parents started taking him to counseling in fall 2014. *Id.* In February 2015, B.S. had another anxiety attack. *Id.* B.S. began seeing a psychiatrist, who prescribed a number of medications, including EnLyte, Prozac, and Quillivant. *Id.*

But the medications did not resolve B.S.'s mental health struggles. On March 22, 2016, B.S. attempted suicide by driving his car at seventy miles per hour into a concrete median. *Id.* B.S. was subsequently admitted to Houston Behavioral Hospital ("HBH"). *Id.* at 124-25. Doctors at HBH adjusted his medication and B.S. stepped down to an intensive outpatient program after eight days of hospitalization. *Id.* at 125. B.S. remained in intensive outpatient care through May 2016. *Id.* After ending intensive outpatient care, B.S. deteriorated further, to the point that he began to self-medicate and his parents refused to leave him alone, even at night. *Id.* at 126. B.S.'s condition became so poor that his counselor recommended immediate hospitalization for stabilization. *Id.* B.S.'s parents readmitted him to HBH on June 23, 2016. *Id.*

After several days of hospitalization, HBH abruptly discharged B.S. when BHO indicated it would not pay for further treatment at HBH. *Id.* B.S.'s psychiatrist at HBH recommended immediate transfer to an RTC facility based on B.S.'s condition. *Id.* at 126-27 ("She recommended [B.S.] be transferred directly to the RTC with a specific recommendation not to bring him home . . . because of his suicidal thoughts and previous history."). B.S.'s parents selected Catalyst, and arranged for a transport to Utah. *Id.* at 127. B.S. received care at Catalyst from June 28, 2016 to

May 22, 2017.  In August 2016, while at Catalyst, B.S. attempted suicide while unsupervised in the bathroom.

### III.     DENIAL OF BENEFITS

After B.S. was admitted to Houston Behavioral Hospital for the second time on June 23, 2016, L.S. began investigating residential treatment centers that B.S. could transition to after his discharge from HBH. *Id.* at 126. Plaintiffs assert that on June 24, 2016, L.S. spoke with a BHO representative about RTC programs, including Catalyst. *Id.* Plaintiffs contend that the BHO representative told L.S. that Catalyst was an accredited RTC and therefore BHO would cover the facility without any further information from L.S. *Id.* Specifically, Plaintiffs indicate that the BHO representative told L.S. that BHO would cover 70% of the cost of Catalyst, up to the $2,000 annual out-of-pocket maximum, at which time BHO would cover 100% up to BHO's limit for RTC treatment. *Id.* L.S. states that he confirmed this information with two other BHO representatives. *Id.* BHO further advised L.S. that nothing needed to be done until B.S. was admitted to Catalyst, at which point the insurance coverage would be organized with Catalyst. *Id.* Based in part on this information, B.S.'s parents enrolled him at Catalyst. However, BHO represents that it has no record of the aforementioned conversations between L.S. and BHO representatives. BHO states that it keeps careful records of all conversations between representatives and Plan participants. Moreover, BHO notes that the percentages purportedly cited by the BHO representatives do not accurately reflect the Plan coverage.

BHO did not pay for any services at Catalyst. As a result, Plaintiffs and Catalyst requested a retrospective review on September 9, 2016. *Id.* at 28, 564. During a retrospective review, BHO reviews services already provided for retrospective authorization. Following a retrospective review by Dr. Vaswani, BHO sent Plaintiffs an initial denial letter on September 23, 2016. *Id.* at 104-06.

BHO informed Plaintiffs that it could not authorize coverage for B.S. because "the selected non-network facility does not appear to provide intense enough therapeutic programming to meet your needs." *Id.* at 104. BHO pointed to two pieces of evidence for its conclusion. First, the Catalyst program "does not include weekly psychiatrist visits." *Id.* Second, it "does not appear to provide sufficient structured/supervised programming." *Id.* Although BHO did not include this information in its denial letter, BHO's additional rationale for denying coverage was the fact that B.S. attempted to hang himself in August 2016 while in Catalyst's care. *Id.* at 27. BHO did not deny that B.S. needed RTC-level care. *Id.* at 104 ("[M]edical necessity appears to have been met for 24 hour services at the mental health residential level of care . . . ."). Rather, it "recommend[ed] [B.S.] seek mental health residential services at an alternate facility that provides more intensive daily programming." *Id.* Despite BHO's denial of coverage, B.S.'s parent did not transfer him to a facility that met BHO's requirements.

BHO permits providers to request reconsideration within three days of an initial denial. *Id.* at 105. The reconsideration involves a conversation between the treating practitioner and BHO, and does not constitute part of the appeals process. *Id.* The clinical director at Catalyst requested reconsideration. BHO's reviewer, Dr. Cohen, spoke with Shayden Bertagnolli, LMFT, on September 26, 2016. *Id.* at 36. Based on this conversation, Dr. Cohen noted that "no psychiatrist is involved in the treatment program" and that "med[ication]s [are] provided by [a] nurse practitioner." *Id.* Dr. Cohen concluded that "the specific residential treatment program under review cannot be validated as medically necessary to address your treatment needs." *Id.* Dr. Cohen provided two reasons. First, "there is no validation of at least weekly active involvement of a psychiatrist to oversee your treatment." *Id.* And second, "it is reported that while attending the program you had a serious attempt to end your life and it is not possible to validate that there is

6

sufficient staff training and programmatic structure including supervision of staff; completion of an appropriate treatment plan; and oversight regarding an appropriate medication regimen to provide for your safety." *Id.* Again, Dr. Cohen confirmed that B.S. would qualify for coverage "at an alternative residential facility where an active and appropriate treatment plan could be provided." *Id.*[2]

Plaintiffs sent several letters to BHO that BHO construed as a level one appeal. *Id.* at 1443-44, 1446-52. In their first letter they reasserted that BHO representatives had previously stated that BHO would cover care at Catalyst. *Id.* at 1443. In response to BHO's concerns about the lack of weekly psychiatric treatment, Plaintiffs stated that "we have contacted Catalyst and they will arrange the on staff psychiatrist to have weekly consultations with [B.S.]." *Id.* And in response to BHO's concerns about adequate supervision, Plaintiffs noted that even when hospitalized at HBH, B.S. was permitted to use the bathroom unsupervised. *Id.* Therefore, Plaintiffs argued, the bathroom suicide attempt at Catalyst would not have been prevented even had B.S. been in hospitalized care. Plaintiffs' second letter outlined B.S.'s medical history, including his increasing anxiety, suicide attempt, and hospitalizations. *Id.* at 1446-52. On October 19, 2016, BHO denied Plaintiffs' level one appeal. *Id.* at 108-10. BHO provided an identical conclusion and rationales as stated in the initial denial. *Id.* at 108.

Plaintiffs filed a level two appeal on January 5, 2017. *Id.* at 120-36. The appeal included B.S.'s full medical record at Catalyst up to that point. *Id.* at 177-598. On January 26, 2017, BHO denied Plaintiffs' appeal. *Id.* at 112. BHO again confirmed that "medical necessity appears to have

---

[2] Based on the record, it is not clear whether BHO conveyed this message to Plaintiffs. The statement is included at the end of the reviewer's notes, and it is written in the language typically included in denial letters (i.e., addressing the letter to B.S.). But the record does not include evidence of a reconsideration denial letter transmitted to Plaintiffs. Nevertheless, these rationales were clearly conveyed to Plaintiffs on numerous occasions.

7

been met for 24 hour services at the mental health residential level of care." *Id.* But, just as in the previous denials, BHO found that Catalyst "does not appear to provide intense enough therapeutic programming to meet your needs." *Id.* As evidence, BHO stated that "[t]he facility does not include weekly psychiatrist visits and does not appear to provide sufficient structured/supervised programming." *Id.* Specifically, the reviewer found that "[t]here is a total of only 15 hours per week of treatment, including 3 hours of treatment, 5 hours of group therapy, and 7-8 hours of experiential recreation." *Id.* Again, BHO confirmed that B.S. could have sought treatment at a "facility where an active and appropriate treatment plan could be provided." *Id.*

Plaintiffs submitted the remainder of B.S.'s treatment records from Catalyst to BHO on August 10, 2017. *Id.* at 600-1420. BHO did not communicate further with Plaintiffs.

## IV. THE PARTIES' ARGUMENTS

Plaintiffs argue that B.S. was entitled to coverage at Catalyst. They argue that BHO indicated multiple times that it would cover care at Catalyst prior to B.S.'s admission at Catalyst. And Plaintiffs argue that B.S.'s care at Catalyst met all of BHO's stated requirements once Catalyst arranged for weekly psychiatrist visits for B.S.

Defendants contend that BHO made a reasonable decision to deny coverage for B.S.'s stay at Catalyst. They argue that there is no evidence in the record demonstrating that Catalyst followed through on its promise to provide weekly psychiatric visits. They further argue that the evidence in the record shows that Catalyst lacked the supervision and structure required for BHO to approve it as a medically necessary and appropriate RTC for B.S.'s treatment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." When both parties move for summary judgment in an ERISA case, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). In these cases, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted).

## ANALYSIS

### I. STANDARD OF REVIEW FOR DENIAL OF BENEFITS CLAIM

Before evaluating BHO's denial of benefits for B.S.'s treatment at Catalyst, the court must first determine the proper standard of review to apply to its evaluation. The court finds arbitrary and capricious review appropriate.

#### A. *ERISA's Framework for Judicial Review*

A plan administrator's denial of ERISA benefits is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where a plan vests such discretion in the plan administrator, a reviewing court will instead apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted). Here, the parties do not dispute that the Plan expressly gives BHO the discretion to develop criteria and determine whether a claimant is entitled to benefits under the Plan. ECF No. 33 at 9-10. But even where a claims administrator has discretion, a court may apply a less deferential standard if a claims administrator's decision failed to comply with ERISA's

procedural requirements. *See Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316-17 (10th Cir. 2009).[3]

### B. *Applicable Standard of Review*

Plaintiffs argue that procedural irregularities marred BHO's review process and require the court to apply de novo review. Specifically, Plaintiffs contend that Defendants failed to demonstrate that they had taken any of the information Plaintiffs submitted during their appeals into account. Plaintiffs further claim that Defendants made no attempt to engage in meaningful dialogue with Plaintiffs, as required by ERISA.

The meaningful dialogue requirement stems from subsections (g) and (h) of 29 C.F.R. § 2526.503-1. *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007) (stating that the subsection (g) and (h) requirements "enable claimants to submit informed responses to the adverse decision and to engage in meaningful dialogue with the plan administrator"). "Subsection (g) . . . requires in part that any notice of denial must (1) provide the

---

[3] The court notes that the Tenth Circuit has explicitly left open the question of whether the substantial compliance rule still applies under the revised 2002 ERISA regulations and has declined to resolve the issue on several subsequent occasions. *See, e.g.*, *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 828 (10th Cir. 2008) ("We find it unnecessary to conclusively decide the continuing validity of the 'substantial compliance' rule . . . ."); *LaAsmar*, 605 F.3d at 800 ("We need not decide whether that 'substantial compliance' doctrine still applies to the revised regulation at issue here . . . ."); *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 n.3 (10th Cir. 2009) ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *Rasenack*, 585 F.3d at 1316 ("Because AIG has failed [the] substantial compliance test . . . we need not decide whether a minor violation of the deadlines or other procedural irregularities would entitle the claimant to *de novo* review under the 2002 amendments."). Plaintiffs argue that the court should instead apply the standard set forth in *Halo v. Yale Health Plan*, 819 F.3d 42, 53-54, 58 (2d Cir. 2016) (holding that failure to comply with any part of the regulations triggers de novo review, unless the irregularities were inadvertent and harmless). Here, because BHO clearly complied with ERISA's procedural requirements under both the substantial compliance and *Halo* standards, the court need not wade into the debate as to whether the "substantial compliance" doctrine still applies under the 2002 ERISA regulations.

specific reason for the adverse determination, (2) reference the specific provision warranting denial, and (3) for medical-necessity denials, explain the scientific or clinical judgment supporting the determination." *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 (10th Cir. 2019) (unpublished). Here, all three denial letters met those requirements: they cited failure to provide care at the appropriate intensity as the specific reason for denial; they referenced the residential treatment criteria that governed the medical necessity determination; and they provided rationales and clinical evidence supporting each rationale. Thus the letters comply with subsection (g).

And, in a broader sense, the evidence in the record demonstrates that BHO meaningfully engaged in dialogue with Plaintiffs. The purpose behind the meaningful engagement requirement is to allow members to clearly understand and respond to the insurance company's rationales for a claim denial. *See Gilbertson*, 328 F.3d at 635-36. BHO clearly expressed its rationale for denying coverage. It repeated this rationale a number of times. And it even communicated with Plaintiffs outside of the formal review process. Specifically, on November 9, 2016, a Senior Account Executive for BHO clarified to Plaintiffs the exact steps that Catalyst would need to take in order to be considered a medically necessary program for B.S. BHO Rec. at 146-47. BHO also offered to provide in-network referrals a number of times. *Id.* at 39 ("October 11, 2016 . . . CCM can given [sic] inn[etwork] referrals. Mom did not request at this time."); *Id.* at 62 (providing a residential treatment center referral on August 1, 2016). And BHO repeatedly reiterated its commitment to providing RTC-level care to B.S., provided that the facility operated at the appropriate intensity of care. These indicia of meaningful engagement demonstrate that BHO clearly communicated its rationales for denial throughout the process and engaged with Plaintiffs to come up with a solution.

Thus, Plaintiffs cannot support their argument that BHO failed to engage Plaintiffs during the appeals process.

Subsection (h) requires that medical reviewers take into account materials provided by a claimant during the appeals process. *Mary D.*, 778 F. App'x at 589 (noting that under 29 C.F.R. § 2560.503-1(h)(2)(iv), BHO must "'take' these materials and arguments 'into account'"). Here, the record indicates that BHO's reviewers considered the records submitted by Plaintiffs. Reviewers referenced Plaintiffs' submissions, including B.S.'s medical records from Catalyst. BHO Rec. at 48. And the reviewers' notes indicate that the reviewers actually read through the records. *See id.* at 39 (noting that BHO doctor "reviewed the clinical information"); *id.* at 48 (indicating that BHO reviewer read Plaintiffs' submission where BHO reviewer includes information from appeal letter in summary). But just as in *Mary D.*, Plaintiffs' counsel "doesn't cite to any authority—nor are we aware of any—that required [BHO] to affirmatively *respond* to these submissions." *Mary D.*, 778 F. App'x at 589; *see also Joel S. v. Cigna*, 356 F. Supp. 3d 1305, 1319 (D. Utah 2018) (finding that "Cigna's failure to discuss [evidence submitted by plaintiffs] does not make the denial arbitrary and capricious"). Thus BHO met its burden of taking into account information provided by Plaintiffs.

Because Plaintiffs have failed to demonstrate any procedural irregularities in BHO's decision, the court applies the arbitrary and capricious standard to its review of BHO's denial of benefits.

## II. ARBITRARY AND CAPRICIOUS REVIEW OF BHO'S DENIAL OF BENEFITS

Applying arbitrary and capricious review means that this court will uphold the administrator's determination "so long as it is predicated on a reasoned basis." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). "The Administrator's decision need not

be the only logical one nor even the best one" as long as it is "sufficiently supported by facts within his knowledge." *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)). In fact, BHO need only show that its "decision resides somewhere on a continuum of reasonableness—even if on the low end." *Adamson*, 455 F.3d at 1212 (citation omitted).

In addition to considering whether the decision is predicated on a reasoned basis, the court must also consider whether the decision is rooted in substantial evidence because a lack of substantial evidence indicates an arbitrary and capricious decision. *Id.* "Substantial evidence means more than a scintilla . . . yet less than a preponderance." *Id.*

### A. *Reasoned Basis and Substantial Evidence*

Unlike many ERISA cases, the parties here do not dispute the appropriate level of care for B.S. Rather, they disagree whether Catalyst provided proper RTC-level care to B.S. The question for the court, then, is whether the evidence in the record supports BHO's determination that Catalyst did not provide appropriate RTC-level care to B.S.

BHO provided two rationales for denying Plaintiffs' claim. First, it argued that Catalyst did not provide sufficient supervision and structured programming. Second, it argued that Catalyst failed to provide weekly psychiatric services. Ultimately, "it's [Plaintiff's] burden to show that [the child's] residential treatment was medically necessary, not the administrator's burden to show they determined it wasn't." *Mary D.*, 778 F. App'x at 595; *Hancock*, 590 F.3d at 1155 (finding that the "[plaintiff] bore the burden of proving the occurrence of a covered loss [i.e., eligibility for coverage]" in the life insurance context); *Pruter v. Loc. 210's Pension Tr. Fund*, 858 F.3d 753, 762 (2d Cir. 2017) ("[A] plaintiff bears the burden of demonstrating entitlement to ERISA benefits."). In satisfying its burden, the plaintiff must point to "the *presence* of any record that

might support a contrary finding." *Mary D.*, 778 F. App'x at 595. The court addresses whether each of BHO's rationales (lack of supervision, structure, and psychiatric services) derives support from the record.

### i. Supervision and Structured Programming

The evidence is murky as to whether B.S. was subject to 24-hour supervision. *See* BHO Rec. at 146 (requiring "[e]vidence of 24-hour supervision by licensed personnel"). BHO records note that Catalyst provided "24hr/7 days per week medically-monitored services" *Id.* at 83. It is not clear exactly what "medically-monitored services" includes, and, specifically, whether it includes supervision. BHO's records also indicate that B.S. was on "line of sight watch – 10-15 feet from a mentor at all times." *Id.* at 30. But this was only "for the weekend" and he was "reassess[ed] Monday." *Id.* The record does not indicate if he remained on line of sight watch, or any other form of 24/7 monitoring, upon reassessment. Of course, B.S.'s suicide attempt also raises concerns that Catalyst did not provide sufficient supervision. *Id.* at 35. Absent any affirmative evidence that Catalyst provided 24-hour supervision, Plaintiffs have failed to establish that Catalyst provided sufficient supervision for B.S.

With regard to structured programming, a BHO reviewer's notes record that the Catalyst Office Manager, Mikell, stated "about 6 hours is structured programming." *Id.* at 83-84. However, it is unclear whether this refers to six hours per day, or six hours per week. *See id.* at 146 (requiring "[a] program schedule that demonstrates structured therapeutic programming, led by a licensed professional, for at least 6 hours of therapeutic activities of some kind, 7 days per week"). Catalyst's website, included as an exhibit to Plaintiffs' appeal letter, indicates that "[e]ach student receives a minimum of 15 hours of therapeutic treatment weekly." *Id.* at 164. The website, of course, does not indicate exactly how many hours of treatment B.S. received each day. But, again,

14

Plaintiffs fail to point to any affirmative evidence demonstrating that B.S. received six hours of therapeutic programming each day. In fact, B.S.'s master treatment plan indicates that Catalyst planned to engage him in family therapy once per week, group therapy three to four times per week, and individual therapy once per week. *Id.* at 1315. Similarly, the treatment request form submitted by Catalyst to BHO indicates that B.S. was receiving "2 hours weekly individual therapy, 4x weekly group therapy, 1x weekly family therapy, 2x weekly recreation therapy." *Id.* at 22. Even if each of these sessions were several hours, it would not reach the level of structured programming required by BHO for RTC care.

### ii. Physician Oversight

The evidence in the record clearly supports BHO's contention that B.S. did not receive the requisite amount of psychiatric care at Catalyst. BHO repeatedly notified B.S.'s family that the facility must provide at least one hour of psychiatric care weekly. But it is unclear that B.S. *ever* saw a psychiatrist while at Catalyst. His initial psychiatric evaluation appears to have been completed by a nurse practitioner, "J. Blake Petrick, PMHNP."[4] *Id.* at 573. And the same nurse practitioner managed his medications. *See, e.g.*, *id.* at 958, 1011, 1073. Most of the substantive progress and treatment notes in his record come from a licensed marriage and family therapist, Shayden Bertagnolli. Further, the treatment records list four members of B.S.'s treatment team, none of whom were licensed psychiatrists: Therapist Lisa Dickman, LCSW; Academic Director Nicole Butler, MS; Clinical Director Adam Poll, LMFT; and Therapist Shayden Bertagnolli, LMFT. *See, e.g.*, *id.* at 650, 663, 679.

Indeed, the only evidence provided by Plaintiffs suggesting that B.S. saw a psychiatrist while at Catalyst was the letter from L.S., stating that "we have contacted Catalyst and they will

---

[4] PMHNP is shorthand for a psychiatric-mental health nurse practitioner.

15

arrange the on staff psychiatrist to have weekly consultations with [B.S.]." *Id.* at 1443. This assertion does not meet Plaintiffs' burden. To prevail on their claim, Plaintiffs would need to point to evidence in the record that Catalyst followed through on its promise that B.S. would see a psychiatrist. But "Plaintiffs concede that the Catalyst records do not, in and of themselves, demonstrate that Plaintiffs' representations were correct." ECF No. 38, at 12. Plaintiffs' briefing repeatedly casts doubt on BHO's conclusions about the intensity of care received by B.S. But Plaintiffs point to no evidence that Catalyst met the Plan's medical necessity criteria for residential treatment care by providing any psychiatric care, much less weekly psychiatrist visits.

In fact, it is unclear if B.S. ever saw any sort of licensed doctor while at Catalyst. The basic definition of RTC care in the Plan requires "medical supervision by a doctor (M.D./D.O.)." *See* CV Rec. at 229. But Plaintiffs have provided no evidence—outside of a screenshot of Catalyst's website showing that Dr. Matt Gardiner was on staff, *see* BHO Rec. at 167,—to establish that a doctor supervised B.S.'s care at Catalyst. The record contains no treatment notes from a doctor, nor any psychiatric evaluations completed by a doctor. There is no record that a doctor on staff ever communicated with B.S.'s family. In fact, Dr. Gardiner's name does not appear at any point in B.S.'s medical records from Catalyst. Instead, all of the psychiatric notes and the psychiatric evaluation included in the record are signed by the nurse practitioner on staff. In sum, the record strongly supports the conclusion that—in addition to failing to provide weekly psychiatric visits—Catalyst failed to ensure that a licensed doctor oversaw B.S.'s care at Catalyst in any capacity.[5] These are basic, minimum requirements for RTC care under the terms of Plan. Thus, BHO's

---

[5] This court regularly reviews administrative records in ERISA cases. In this court's experience, it is common for the record to contain therapeutic notes, medication management notes, psychiatric evaluations, and correspondence with parents authored by a child's RTC doctor or psychiatrist. The court finds the glaring absence of any such record in this case compelling.

decision to deny B.S. coverage at Catalyst, on the basis that the program did not meet BHO's requirements for RTC care, was eminently reasonable and supported by substantial evidence.

### B.     *BHO's Promise to Pay Benefits*

Plaintiffs assert that BHO's prior representations regarding coverage at Catalyst entitled them to benefits coverage. Specifically, Plaintiffs contend that BHO represented that it would cover treatment at Catalyst without need for any additional information prior to B.S.'s parents' decision to place him at Catalyst. ECF No. 31, at 5. Plaintiffs maintain that BHO representatives conveyed this information to them telephonically. But BHO claims that it has no record of any such conversation. Thus, the only evidence that these phone calls occurred is L.S.'s assertion in her appeals letter that she received the above information from BHO.

This court is sympathetic to Plaintiffs' plight. It appears that L.S. may have received misleading information from BHO representatives prior to B.S.'s placement at Catalyst. But this court's role under ERISA is simply to evaluate whether BHO made a reasoned benefits determination, supported by substantial evidence. Whether BHO representatives made misleading promises to Plaintiffs prior to the claims procedure is not part of the analysis. Considering the record in front of BHO, the decision to deny coverage was reasonable for the reasons discussed above.

This court also understands that Plaintiffs may feel frustrated that they did not receive feedback about the deficiencies in the Catalyst program until September 23, 2016, nearly three months after B.S. enrolled in Catalyst. But regardless of what BHO represented to Plaintiffs on the phone, the Plan documents clearly state that mental health and substance use treatment out-of-network inpatient services "[r]equire notification to [BHO] within two business days of admittance." CV Rec. at 34. As the Plan states, "[n]otification to [BHO] allows [BHO] to review

17

your provider's proposed treatment plan for medical necessity and advise your provider how many . . . days of care will be covered based on your medical need." *Id.* Had Plaintiffs promptly notified BHO of B.S.'s admission to Catalyst, as required by the Plan, BHO could have pointed out Catalyst's shortcomings and facilitated B.S.'s transfer to another, covered facility more rapidly. The Plan further outlines how to file a claim and explains how members receive notification of the benefit determination. *See id.* at 53, 56. At no point does the Plan represent that preauthorization via telephone constitutes a guarantee of benefits coverage. At most, the Plan provides that members can call BHO for assistance locating in-network providers. *Id.* at 127. In fact, at least one BHO representative reminded B.S.'s parents "to call back for authorization when [appointment is] scheduled." BHO Rec. at 63.

Plaintiffs may have genuinely believed that Catalyst was the best environment for B.S. But faced with the information that Catalyst did not meet BHO's RTC standards, Plaintiffs were not entitled to continue insisting on coverage for care at Catalyst. The Plan is only contractually required to "pay[] benefits for covered charges for services, supplies, and treatment that are medically necessary and appropriate, *as determined by the claims administrator*." CV Rec. at 34 (emphasis added). And RTC-level care without any sort of physician supervision clearly did not meet the standards set out by BHO and the Plan.

In sum, the court's review is limited to asking whether BHO's determinations were arbitrary and capricious. And because the court concludes that substantial evidence supports BHO's determination, it must affirm BHO's denial of coverage for B.S.'s treatment.

## CONCLUSION

For the reasons stated above, the court GRANTS summary judgment for Defendants and DENIES summary judgment for Plaintiffs.

DATED December 21, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge